IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| IN RE: | ) |
| | ) CASE NO. 313-08657 |
| MICHAEL ROSS SMITH, | ) |
| | ) JUDGE MARIAN F. HARRISON |
| Debtor. | ) |
| | ) CHAPTER 7 |
| | ) |
| PAUL ALLEN, | ) |
| | ) ADV. NO. 314-90010 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL ROSS SMITH, | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____

**MEMORANDUM OPINION**
_____

This matter is before the Court upon Paul Allen's ("Mr. Allen") complaint to determine the dischargeability of his claim pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), (a)(6), and (a)(10). Mr. Allen also asserts that the debtor, Michael Ross Smith ("Mr. Smith"), violated the Tennessee Consumer Protection Act ("TCPA") and that he is entitled to attorney fees and treble damages. For the following reasons, which represent the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052, the

Court finds that Mr. Allen's claim is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(10) and that Mr. Smith violated the TCPA.

## I. BACKGROUND

Diatherix Laboratories, Inc. ("Diatherix") developed cutting edge medical testing technology and contracted with Diagnostic Network Alliance, LLC ("DNA") to be the exclusive distributor of this technology in the United States. Rather than using an inside sales force, DNA set up a series of regional distributors. Paul Ketchel, a founder and chief operating officer of DNA contacted Mr. Smith about the possibility of getting involved in the distribution of Diatherix's testing. In response, Mr. Smith began the creation of Geneosis Distributing LLC ("Geneosis") in April 2008. Mr. Smith testified that he used his own money, including his 401k, during the startup phase of Geneosis. On July 15, 2008, Geneosis was officially formed. Initially, Mr. Smith was the 100% owner of Geneosis and retained all voting rights. He never invested any capital into Geneosis. In October 2008, Mr. Smith needed more funds and received loans from two of his acquaintances, John Scott ("Mr. Scott") and Stephen Proctor ("Mr. Proctor") for $100,000 each. Eventually, these loans were converted into equity in Geneosis. Mr. Scott and Mr. Proctor, as well as John Yoste ("Mr. Yoste"), became officers and voting members of Geneosis. The voting members of Geneosis, with the exception of Mr. Yoste who lived out of town, were all members of the same country club as were Mr. Allen and Jason Roberts ("Mr. Roberts"), who had been friends with Mr. Smith since childhood. At the time, Mr. Allen and

Mr. Roberts worked together as certified financial planners. Talk at the country club eventually led to Mr. Allen and Mr. Roberts having a meeting with Mr. Smith about potentially investing in Geneosis. The parties went over a spreadsheet with information about Geneosis, budgets, and sales forecasts. The spreadsheet reflected that Mr. Smith intended to take a salary of $15,000 per month. There was discussion regarding Mr. Smith's potential salary but the testimony indicates that Mr. Smith told Mr. Allen and Mr. Roberts that he would not receive a salary until Geneosis started generating income. Mr. Roberts had a second meeting with Mr. Smith and the other officers of Geneosis. Afterwards, Mr. Allen and Mr. Roberts decided to invest in Geneosis. Mr. Allen signed a Letter of Intent to purchase the units in Geneosis from Mr. Smith on December 19, 2008.[1]

Mr. Allen provided two checks made payable to Geneosis. The first check, dated December 22, 2008, was from Mr. Allen's mother in the amount of $40,000. Mr. Allen testified that Mr. Smith insisted that he would need the investment immediately, so Mr. Allen asked his mother to give him the money for part of the investment. The second check, dated

---

[1] At trial, Mr. Smith argued that the parol evidence rule prohibited any evidence concerning representations made by Mr. Smith prior to the execution of the Letter of Intent. The document in question stated that "[t]his Term Sheet contains the preliminary understanding between the parties with respect to its subject matter and supersedes any prior understandings and agreements between them with respect thereto." By its own terms, the Letter of Intent was not the final expression of the parties' agreement, and therefore, the parol evidence rule does not apply. *See Next Generation, Inc. v. Wal-Mart, Inc.,* 49 S.W.3d 860, 863 (Tenn. Ct. App. 2000) (citing T.C.A. § 47-2-202). Moreover, as pointed out by Mr. Allen, "the parol evidence rule does not apply to allegations of fraudulent misrepresentation inducing a party to enter a contract." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 567 (6th Cir. 2003) (citations omitted).

February 10, 2009, was written by Mr. Allen for $20,000. Both checks were endorsed by Mr. Smith and deposited into the Geneosis bank account. It was Mr. Allen's understanding that he was investing in Geneosis and that his money would be used to further the company, grow a sales force, expand revenues, and cover salaries and expenses. Mr. Smith testified that he was selling his own shares in Geneosis and that the proceeds from the sales of units were his personally. Mr. Smith did not explain why the checks were written to Geneosis if the funds were to go directly to him.

The day prior to receipt of Mr. Allen's $40,000 investment, December 21, 2008, Mr. Smith's two personal bank accounts and Geneosis' bank account had a combined negative balance of approximately $330. The $40,000 was deposited into Geneosis' bank account on December 22, 2008, and that same day, Mr. Smith withdrew $10,000 ($7000 deposited into his personal bank account, $3000 taken as cash). The next day, December 23, 2008, Mr. Smith wrote himself a check for $20,000 out of the Geneosis bank account and deposited it into his personal account. One week later, Mr. Smith wrote himself a check for $9000 out of the Geneosis bank account and deposited it into his personal account. Accordingly, one week after Mr. Allen's initial $40,000 investment, the Geneosis bank account had a balance of $975.57.

On February 12, 2008, two days after Mr. Allen's second check was received, Mr. Smith wrote a $20,000 check to himself out of the Geneosis account and deposited it into his personal account. At that point, Mr. Smith's bank accounts had a negative balance

4 - U.S. Bankruptcy Court, M.D. Tenn.

in the amount of $2586.57. By March 18, 2009, Mr. Smith only had a combined total of $15 in his personal bank accounts, and Geneosis had $1075 in its bank account. By April 17, 2009, Geneosis' bank account had a balance of $75.57. From the creation of Geneosis on July 15, 2008, through March 18, 2009 (roughly eight months), Mr. Smith took a total of $305,120 out of Geneosis. Prior to May 15, 2009, Geneosis did not generate any revenue. Also prior to May 15, 2009, Mr. Smith was the only individual who received any funds from Geneosis.

In the two years Geneosis existed, Mr. Smith took $611,000 out of Geneosis. The bank records reflect that Mr. Smith withdrew funds from Geneosis and put them into his personal accounts and wrote checks payable to cash and signed them. Mr. Smith asserts that any funds he received for the purchase of his stock belonged to him personally. Yet, Mr. Smith testified that "guaranteed payments were the terms that we used for salaries," and Geneosis' tax records reflect that Mr. Smith took $225,120 in guaranteed payments in 2008 and $277,110 in 2009. Mr. Smith's personal tax records reflect that he only claimed $49,878 in self-employment income in 2008 and $43,613 in 2009. The $277,110 paid to Mr. Smith in 2009 was over $100,000 more than Geneosis generated in gross sales that year. In other words, the lion's share of Geneosis' expenses in 2009 went to Mr. Smith. The amended operating agreement, memorializing Mr. Allen's non-voting units, was not finalized until March 19, 2009. By then, his entire investment had been spent.

There was endless testimony of the events that led to the demise of Geneosis, but most was irrelevant to the issues presented. In December 2009, DNA learned that its master distribution contract from Diatherix was being terminated. As a result, in March 2010, DNA terminated its contracts with all of its distributors, including Geneosis. Without the distribution rights, Geneosis' operations came to an end. There was discussion of Geneosis suing DNA for unpaid commissions in the amount of $350,000, but DNA threatened to countersue for tortuous interference. The allegations of tortuous interference revolved around emails that Mr. Proctor sent to and received from the president of Diatherix and some of DNA's other distributors. After these allegations came to light, the members of Geneosis decided not to pursue litigation. Eventually, Geneosis paid Mr. Allen back $10,235 of his investment, leaving a balance of $49,765.

On January 14, 2011, Mr. Allen filed a complaint against Mr. Smith in state court, alleging claims against Mr. Smith for fraud and promissory fraud, breach of fiduciary duty, and violations of the TCPA. The trial was set for April 12, 2012, but it did not go forward because Mr. Smith filed a Chapter 7 bankruptcy on April 10, 2012. In his petition, Mr. Smith listed Mr. Allen as having an unsecured nonpriority claim for a business loan in an unknown amount. Mr. Allen did not file a proof of claim in that case, but he did file a complaint to determine dischargeability. The Court granted the U.S. Trustee's motion to approve stipulation of waiver of discharge on November 28, 2012, and Mr. Allen voluntarily dismissed the adversary that same date. Mr. Smith was later charged with three counts of

bankruptcy fraud and eventually pled guilty to one count of making a false statement in connection with his bankruptcy.

On October 2, 2013, Mr. Smith filed a voluntary Chapter 11 petition. A motion to convert the case to Chapter 7 was filed on behalf of Mr. Allen and Mr. Proctor. After a hearing, the Court granted the motion, and the case was converted to Chapter 7 on March 24, 2015. Mr. Allen filed this adversary complaint on January 6, 2014.

## II. DISCUSSION

Generally, exceptions to discharge are to be construed strictly against the creditor. ***Gleason v. Thaw***, 236 U.S. 558, 562 (1915). The burden of proof falls upon the party objecting to discharge to prove by a preponderance of the evidence that a particular debt is nondischargeable. ***Grogan v. Garner***, 498 U.S. 279, 291 (1991). The primary purpose of bankruptcy is to grant a "fresh start to the honest but unfortunate debtor." ***Marrama v. Citizens Bank of Mass.,*** 549 U.S. 365, 367 (2007) (citation and internal quotation marks omitted). Because the bankruptcy discharge is central to a "fresh start," discharge exceptions "are to be strictly construed against the creditor and liberally in favor of the debtor." ***Risk v. Hunter (In re Hunter),*** 535 B.R. 203, 212 (Bankr. N.D. Ohio 2015) (citations omitted).

## A. 11 U.S.C. § 523(a)(2)(A)

Under 11 U.S.C. § 523(a)(2)(A), a creditor has the burden of proving by a preponderance of the evidence five elements:

(1) a materially false representation (2) made with knowledge of its falsity and (3) with the intent to deceive, (4) reasonably relied upon by the creditor and (5) proximately resulting in the creditor's loss.

*Wilson v. Mettetal (In re Mettetal)*, 41 B.R. 80, 87 (Bankr. E.D. Tenn. 1984) (citation omitted); *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert),* 141 F.3d 277, 280-81 (6th Cir. 1998) (citation omitted).

### 1. Material Misrepresentation with Knowledge of its Falsity

Based on the testimony, the Court believes that Mr. Smith misrepresented to Mr. Allen that his investment would be used for the express purpose of building a sales force, expanding and creating distribution channels, and creating revenue streams for Geneosis. Initially, it appeared that the issue was whether Mr. Smith informed his investors that he intended to take a substantial monthly salary from Geneosis. This, however, is irrelevant because now Mr. Smith asserts that Mr. Allen's payments were to him personally for the purchase of his stock in Geneosis (even though the checks were written to Geneosis rather than Mr. Smith). In fact, even Mr. Roberts, who testified on behalf of Mr. Smith, did not realize until after the fact that he was buying the units from Mr. Smith personally rather than investing in Geneosis. Based on the proof, the Court finds that Mr. Smith represented to Mr. Allen that his investment would be used for the express purpose of building a sales force,

expanding and creating distribution channels, and creating revenue streams for Geneosis when his intent was to use the funds to support his personal lifestyle.

## 2. <u>Intent to Deceive</u>

A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case. ***Rembert*** at 281-82. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. ***Hamo v. Wilson (In re Hamo)***, 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). "[A] debtor's intent to deceive a creditor occurs when the debtor makes a false representation which the debtor knows or should have known would induce another to advance money, goods or services to the debtor." ***Bernard Lumber Co. v. Patrick (In re Patrick)***, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001) (citation omitted).

Mr. Smith's intent to deceive is reflected by his words and actions. Mr. Smith represented to Mr. Allen that he was investing in Geneosis, not paying Mr. Smith individually for his stock in Geneosis. Even Mr. Allen's checks were written to Geneosis, rather than Mr. Smith. Although presented as funds for Geneosis, Mr. Allen's initial investment was essentially gone within two weeks, and his second investment was gone within two days. All of these funds went to Mr. Smith either by transfer or check written by himself. Mr. Smith's intent is also reflected in his running of Geneosis. Mr. Smith testified

that no one, including himself, invested any capital in Geneosis. Mr. Smith testified that funds received from investors were for the purchase of his stock, but he also testified that the "guaranteed payments" he received were for his salary and the reimbursement of expenses. There is no documentation to collaborate his testimony regarding either scenario. Instead, the record shows that Mr. Smith took funds from Geneosis but never documented a basis. Even when Geneosis was not generating revenue, Mr. Smith was taking large amounts of money out of Geneosis. In 2008, Mr. Smith took $310,000, in 2009, he took $277,000, and by the time Geneosis collapsed, Mr. Smith had drawn a total of $611,000.

### 3. Justifiable Reliance

In *Field v. Mans*, 516 U.S. 59 (1995), the Supreme Court addressed the reliance element of 11 U.S.C. § 523(a)(2)(A). The question presented to the Court was the requisite "level of a creditor's reliance on a fraudulent misrepresentation necessary to place a debt . . . beyond release." *Id.* at 61. On this question, the Court held that only justifiable reliance was required. *Id.* at 77. Justifiable reliance is based on a subjective interpretation. *Frost & Co., Inc. v. Smithey (In re Smithey)*, 474 B.R. 830, 838 (Bankr. N.D. Ohio 2012) (citation omitted).

Under the justifiable reliance standard, a creditor is merely required to act appropriately according to his individual circumstances. *Id.* (citation omitted). In other words, justifiable reliance means that a creditor is "required to use his senses, and cannot

10 - U.S. Bankruptcy Court, M.D. Tenn.

recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." ***Field v. Mans***, 516 U.S. at 71 (citation omitted).

Mr. Allen justifiably relied on Mr. Smith's statements regarding how his investment would be used. There is no question that Geneosis was a high risk investment, but there was no reason to believe that Mr. Smith planned to siphon Mr. Allen's money out of Geneosis and into his own accounts almost immediately upon receipt.

### 4. Proximate Cause

"Proximate cause is something more than 'speculation as to what the creditor might have done in hypothetical circumstances.'" ***Haney v. Copeland (In re Copeland)***, 291 B.R. 740, 767 (Bankr. E.D. Tenn. 2003) (citation omitted). It depends on whether "the [d]ebtor's representations [were] the proximate cause of its losses, which depends on whether the [debtor's] conduct has been so significant and important a cause that the [debtor] should be legally responsible." ***Tweedie v. Hermoyian (In re Hermoyian)***, 466 B.R. 348, 370 (Bankr. E.D. Mich. 2012) (quoting ***WebMD Practice Servs., Inc. v. Sedlacek (In re Sedlacek)***, 327 B.R. 872, 888 (Bankr. E.D. Tenn. 2005)). In other words, "[t]here must be a direct link between the alleged fraud and the creation of the debt." ***Id***. (internal quotation marks and citation omitted).

The proof showed that Geneosis eventually failed because it lost the distributorship agreement with DNA. It is also clear that Mr. Smith was systematically undermining Geneosis' viability by bleeding the company dry. Any flexibility the company might have had to seek other streams of revenue was impossible given the intentionally engineered under-capitalization of the company. In fact, Mr. Smith testified that he never contributed any capital to Geneosis and that he never considered the funds invested as capital. Instead, he said the contributed funds were his individually from his sale of stock. Mr. Smith's business model would not likely have succeeded. Geneosis had no capital, Mr. Smith withdrew or transferred funds to himself whenever funds were available, and the voting members agreed they should each receive significant salaries despite the lack of any significant revenue.

Accordingly, the Court finds that Mr. Allen's claim in the amount of $49,765 is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## B. 11 U.S.C. § 523(a)(4)

11 U.S.C. § 523(a)(4) provides that a discharge can be denied for a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Section 523(a)(4) creates two distinct exceptions to discharge: (1) fraud or defalcation while acting in a fiduciary capacity, and (2) embezzlement or larceny whether or not acting in a

fiduciary capacity. *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982).

"The phrase 'while acting in a fiduciary capacity' applies only to the words 'fraud or defalcation'; embezzlement and larceny are separate grounds for non-dischargeability under § 523(a)(4) whether or not a fiduciary relationship existed." *Kilns v. Pierron (In re Pierron),* 448 B.R. 228, 240 (Bankr. S.D. Ohio 2011) (citation omitted). Accordingly, "a plaintiff can prevail under § 523(a)(4) by establishing that the [debtor] committed either (1) fraud or defalcation while acting in a fiduciary capacity, or (2) embezzlement, or (3) larceny." *Id.*

In order to find a debt nondischargeable under 11 U.S.C. § 523(a)(4) for fraud or defalcation, the Sixth Circuit requires, by a preponderance of the evidence: "(1) a pre-existing fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss." *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005) (citation omitted).

In the present case, Mr. Allen asserts that Mr. Smith's actions constitute fraud or defalcation while acting in a fiduciary capacity. Mr. Allen cites T.C.A. §§ 48-249-403 and -404 as creating a fiduciary duty of a member of a limited liability company. Unfortunately for Mr. Allen, whether a relationship falls within the scope of 11 U.S.C. § 523(a)(4) is a

question of "federal, not state, law," *id*. at 389 (citation omitted), and the concept of fiduciary for purposes of 11 U.S.C. § 523(a)(4) is narrower than it is under state law. ***Id.*** at 391. The "fiduciary capacity" component of 11 U.S.C. § 523(a)(4) applies only to those situations involving an express or technical trust. Establishing the existence of such a trust requires the creditor to show: "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." ***Ohio Carpenter's Pension Fund v. Bucci (In re Bucci),*** 493 F.3d 635, 639–40 (6th Cir. 2007) (citation omitted). "[T]he requisite trust relationship must exist prior to the act creating the debt and without reference to it." ***Id.*** at 642 (internal quotation marks and citations omitted).

There was no proof that an express or technical trust was created. Thus, Mr. Allen's assertion that Mr. Smith committed fraud or defalcation while acting in a fiduciary capacity must fail.

### C. 11 U.S.C. § 523(a)(6)

Pursuant to § 523(a)(6), a debt is nondischargeable when the debt is "for willful and malicious injury by the debtor to another entity or to the property of another entity." This discharge exception requires an injury resulting from conduct that is "both willful and malicious." ***Markowitz v. Campbell (In re Markowitz)***, 190 F.3d 455, 463 (6th Cir. 1999). "[U]nless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' . . . he has not committed a 'willful

Case 3:14-ap-90010    Doc 55    Filed 04/18/17    Entered 04/18/17 13:02:04    Desc Main
Document      Page 14 of 20

and malicious injury' as defined under § 523(a)(6)." *Id.* at 464 (internal citation omitted). It is insufficient that a reasonable debtor "should have known" that his conduct risked injury to others. *Id.* at 465 n.10. Instead, the debtor must "will or desire harm, or believe injury is substantially certain to occur as a result of his behavior." *Id.* "The conduct 'must be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from . . . legal rights. . . . [K]nowledge that legal rights are being violated is insufficient to establish malice.'" *Steier v. Best (In re Best),* 109 F. App'x 1, 6 (6th Cir. 2004) (citation omitted). In other words, "[l]ack of excuse or justification for the debtor's actions will not alone make a debt nondischargeable under § 523(a)(6)." *S. Atlanta Neurology & Pain Clinic, P.C. v. Lupo (In re Lupo),* 353 B.R. 534, 550 (Bankr. N.D. Ohio 2006) (citation omitted).

While the proof of intent is strong, there was no indication that Mr. Smith's actions were willful. Having observed Mr. Smith and listened to his testimony in several hearings, it is clear to the Court that Mr. Smith's number one concern was himself. Mr. Smith was motivated by maintaining his lifestyle and making more money, and it seems unlikely that he gave any thought to the consequences of his actions in relation to Mr. Allen. Without the element of malice, Mr. Allen's assertion that his claim is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6) must also fail.

### D. 11 U.S.C. § 523(a)(10)

Pursuant to 11 U.S.C. § 523(a)(10), a debt "that was or could have been listed or scheduled by the debtor in a prior case concerning the debtor under this title . . . in which the debtor waived discharge, or was denied a discharge under section 727(a)(2), (3), (4), (5), (6), or (7)" is non-dischargeable.

"[T]he effect of having a discharge denied is harsh: it renders all the debts/claims which could have been included in the petition forever nondischargeable in bankruptcy, thereby subjecting the debtor's assets and future income to all claims of such creditors." *United States Tr. v. Halishak (In re Halishak),* 337 B.R. 620, 625 (Bankr. N.D. Ohio 2005). *See also Kovacs v. Basford (In re Basford),* 363 B.R. 832, 833 (Bankr. N.D. Ohio 2006) ("The effect of § 523(a)(10) is that a debtor cannot discharge a debt in a future bankruptcy proceeding [where] their discharge was previously denied.").

The plain language of the Code makes clear that the existence of a claim turns on whether a creditor has a right to payment, not whether that right to payment has been reduced to judgment. *See Hutchison v. Birmingham (In re Hutchison),* 270 B.R. 429, 441 (Bankr. E.D. Mich. 2001) ("In our view, however, the notion that the Plaintiff's debt to the Defendant would arise upon entry of a court order is incompatible with the Code. . . . [A] 'debt' is simply 'liability on a claim.' 11 U.S.C. § 101(12). . . . [A] 'claim' means nothing more than a 'right to payment, whether or not such right is reduced to judgment [or] liquidated.'

Case 3:14-ap-90010    Doc 55    Filed 04/18/17    Entered 04/18/17 13:02:04    Desc Main
Document      Page 16 of 20

11 U.S.C. § 101(5)(A). In light of these criteria, it is obviously incorrect to define the debt owed [the creditor], as coming into being if and when she obtains a judgment.") (citation omitted).

Mr. Smith listed Mr. Allen's claim in his first petition, and the Court has found that Mr. Allen has a right to payment. Therefore, Mr. Allen's claim is non-dischargeable pursuant to 11 U.S.C. § 523(a)(10).[2]

### E. Tennessee Consumer Protection Act

"The TCPA provides a private right of action for any consumer who is the victim of 'unfair or deceptive' acts in the course of trade or commerce." ***Menuskin v. Williams***, 145 F.3d 755, 767 (6th Cir. 1998).[3] As an initial matter, Mr. Smith argues that TCPA does not apply because a 2011 amendment to the TCPA excluded the sale or marketing of securities from its coverage. *See* T.C.A. § 47-18-109(h). However, this amendment does not apply to claims accruing prior to October 1, 2011. *See* 2011 Tenn. Pub. Acts 510, § 24. Because

---

[2] Related to this issue, Mr. Allen requested that the Court take judicial notice of an arbitrator's award attached to the complaint filed in a separate adversary. Mr. Smith objected, and the Court took it under advisement. Because the document in question was irrelevant to the issue at hand, it was not considered by the Court.

[3] In October 2011, T.C.A. § 47–18–104(b)(27) was amended to provide that only Tennessee's Attorney General was vested with authority to enforce it. *See* 2011 Tenn. Pub. Acts 510. This amendment applies only to "liability actions for injuries, deaths and losses covered by this act which accrue on or after [October 1, 2011]." 2011 Tenn. Pub. Acts 510, § 24. Accordingly, the prior version of this statute applies in this case.

Mr. Allen filed his original state court complaint in January 2011, the amendment does not apply. *See Gregory v. Lane,* No. 3:11-CV-132, 2012 WL 5289385, *8 (E.D. Tenn. Oct. 24, 2012) (amendment does not apply where plaintiffs filed their complaint on March 18, 2011).

In order to recover under TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice set forth in T.C.A. § 47-18-104(b); and (2) that the defendant's conduct caused an ascertainable loss. T.C.A. § 47–18–109(a)(1). Upon a finding that a provision of the TCPA has been violated, the court may award reasonable attorney's fees and costs. T.C.A. § 47–18–109(e)(1). If the defendant's conduct was willful or knowing, the court may award treble damages. T.C.A. § 47–18–109(a)(3). "*Like punitive damages, treble damages are not intended to compensate an injured plaintiff but rather to punish the defendant and to deter similar conduct in the future.*" **Smith Corona Corp. v. Pelikan, Inc.**, 784 F. Supp. 452, 483–84 (M.D. Tenn. 1992) (citation omitted). In determining whether treble damages should be awarded, a court may consider the following:

    (A) The competence of the consumer or other person;

    (B) The nature of the deception or coercion practiced upon the consumer or other person;

    (C) The damage to the consumer or other person; and

    (D) The good faith of the person found to have violated this part.

T.C.A. § 47–18–109(a)(4). All such damages are excepted from discharge under 11 U.S.C. § 523(a)(2)(A). *See Cohen v. de la Cruz,* 523 U.S. 213, 221 (1998).

The Court has already found that Mr. Smith engaged in deceptive practices and that his conduct caused an ascertainable loss to Mr. Allen. Accordingly, Mr. Smith violated the relevant version of the TCPA. The real question is whether treble damages should be awarded. The Court finds that treble damages are not justified in this case. While Mr. Smith clearly acted in a deceptive manner, Mr. Allen was not the average consumer on the street. Instead, Mr. Allen was a sophisticated certified financial planner who was taken in by his friend. While the Court does not condone Mr. Smith's actions, based on the facts of this case, the award of treble damages would not promote the policy behind treble damages.

Accordingly, in addition to Mr. Allen's claim for $49,765, he is also entitled to reasonable attorney fees. The determination of reasonable attorneys' fees is necessarily a discretionary inquiry by the trial court. **Keith v. Howerton**, 165 S.W.3d 248, 250 (Tenn. Ct. App. 2005). Based on Mr. Allen's testimony, his attorney fees through 2015 were $45,500, and the Court finds that such amount is reasonable and also non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Mr. Allen suggested that his 2016 attorney fees could be addressed by affidavit. The Court declines to award all Mr. Allen's attorney fees for 2016. Mr. Allen could have sought summary judgment as to his 11 U.S.C. § 523(a)(10) claim, as did his co-plaintiff, Mr. Proctor, in early 2016, and mitigated his costs. While a trial on the TCPA claim would have still been needed, the time spent would have been significantly reduced. Instead, Mr. Allen continued to pursue "scorched earth" litigation without regard for cost. Accordingly, the Court will allow counsel for Mr. Allen to submit an affidavit regarding

attorney fees for the first four months of 2016. The Court finds that such fees are reasonable under the circumstances of this case.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Mr. Allen's claim for $49,765 is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(10). In addition, the Court finds that Mr. Smith violated the TCPA, and therefore, Mr. Allen is entitled to attorney fees in the amount of $45,500 plus attorney fees for January through April 2016, to be submitted by affidavit. The Court declines to award treble damages.

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.